Keener v. Crull and Wife.

---

CHARLES F. KEENER, Executor of John Peniger, deceased, Appellant, *v.* GEORGE CRULL AND WIFE, Appellees.

### APPEAL FROM SCOTT.

A debt barred by the statute of limitations, is an existing moral obligation of sufficient validity to support a new promise based upon it, in avoidance of the bar.
The new promise may arise out of such facts as identify the debt, so as to determine its character and amount, and show a present intention and willingness to pay. The promise must be made to the party seeking its benefits, or to some one authorized to act in his behalf.
A promise to a stranger will not take a case out of the statute.

(A party suing should show affirmatively, in his declaration, a sufficient reason for making his case an exception under the statute, or he should be denied a recovery.—BREESE, J.)

THIS is an agreed case, taken by appeal from Scott, from a judgment rendered in the Circuit Court of said county, at the October term, A. D. 1857, which judgment was rendered upon the following state of facts:

Sarah Crull, wife of George Crull, while a *femme sole,* in the lifetime of said John Peniger, deceased, rendered services for said Peniger, which claim for services became barred by lapse of time, and it was insisted by the appellees in the court below, that the case was taken out of the statute of limitations by a subsequent promise, and they relied upon the testimony of George Longwith, which testimony is as follows: That in the month of November, 1850, he (the witness) had a conversation with the said Peniger; had been old neighbors, and they had a long conversation together, at Peniger's; Peniger then told witness that he had agreed to give his daughter, the said Sarah, two hundred dollars a year for her work, and he had not paid her yet, and that she had gone to Ohio. Appellant insists that said testimony of George Longwith is not sufficient to take the case out of the statute of limitations.

It is stipulated, in this case, that said Sarah Crull commenced services in A. D. 1833, she being then of age, and continued in service until December, A. D. 1838.

J. GRIMSHAW and BERRY & HALDEMAN, for Appellant.

KNAPP & CASE, for Appellees.

*Opinion of the Court, by* SKINNER, J. This was an agreed case. The plaintiffs sue, as husband and wife, for a debt due the wife when sole. The case shows that the wife, while sole and of full age, remained with her father, and worked in the family from 1833 to 1838; that, in 1850, the father, who is the defendant's testator, in a conversation with one Longwith, said " that he had agreed to give his daughter, (the now *feme covert* plaintiff with her husband,) two hundred dollars per year for her work, and he had not paid her yet, and she had gone to Ohio." The debt, if one existed, was barred by the statute, and the question is, whether, by reason of the admissions of her father in 1850, the plaintiffs are entitled to recover against his executor?

The great diversity of construction of like statutes, both in the courts of this country and of England, demands in this case

the application of such rule as is consistent with our own decisions, and the current of modern adjudications.

The statute bars the action, and all remedy for recovery of the debt ; and, when the bar is complete, the statute being interposed in defense, no action for the recovery of the debt can be maintained.

The debt, however, is not annihilated, and remains the same as before, excepting that all remedy for enforcement of the obligation is gone.   The debt constituting an unquestioned moral obligation, is, however, a good consideration to support a promise to perform that obligation ; and a new promise, based upon this moral obligation, is binding upon the debtor in avoidance of the bar of the statute.

The new promise may arise out of such facts as identify the debt, the subject of the promise, with such certainty as will clearly determine its character, fix the amount due, and show a present unqualified willingness and intention to pay it, at the time acted upon and acceded to by the creditor, the promissee.

The following cases sustain the rule here laid down : *Ayers* v. *Richards*, 12 Ill. R. 146 ; *Bell* v. *Morrison*, 1 Peters R. 351 ; *Pool* v. *Relfe*, 23 Ala. R. 701 ; *Ten Eyck* v. *Wing*, 1 Michigan R. 40 ; *Brown* v. *State Bank*, 5 English (Ark.) R. 134 ; *Morgan* v. *Wolton*, 4 Penn. State R. 321 ; *Christy* v. *Flemington*, 10 ibid. 129 ; *Shitler* v. *Bremer*, 23 ibid. 413 ; *Hidden* v. *Couzins*, 2 R. I. R. 401 ; *Ventris* v. *Shaw*, 14 N. H. R. 422 ; *Reigne* v. *Despartes*, Dudley's R. 118 ; *Martin* v. *Brooch*, 6 Geo. R. 21 ; *Clark* v. *Dutcher*, 9 Cow. R. 674.

Like any other promise, having legal force and sanction, it must be made to the party seeking its benefits, or to some one authorized to act for him.   A promise to a stranger is insufficient to establish a promise to the plaintiff or the party whom he represents.   *Kyle* v. *Wells*, 17 Penn. State R. 286 ; *Brailsford* v. *James*, 3 Strob. R. 171 ; *Martin* v. *Brooch*, 6 Geo. R. 21.

Were this a new question, we should hold that the action could alone be brought upon the new promise.   But the current of authority and long usage sanction the practice of declaring upon the original cause of action, and of replying the new promise in avoidance of the statute of limitation ; and we do not feel at liberty to disturb a rule so well settled.

Tested by the rules stated, the plaintiffs cannot recover.   The language of the defendant's testator was used to a stranger having no concern in the matter, or right to act for the party in interest, the amount of the debt was not named or in any manner indicated, nor was there any language unequivocally importing a present intention or undertaking to pay.

*Judgment reversed.*

*Separate Opinion,* by BREESE, J.   I concur in the opinion pronounced by the majority of the court, as it reverses the judgment of the Circuit Court, and is a great improvement on earlier rulings of this court on the statute of limitations.   But I go much further, and hold that no promise, express or implied, can take a case out of its operation, and thereby utterly destroy a most wise and salutary law.   To illustrate the view I entertain, it is necessary to go back to the origin of this statute, and the earlier adjudications of the British courts upon it.

The first act of limitations was passed in the twenty-first year of the reign of James the First, and is entitled *"An act for limitation of actions, and for avoiding of suits in law."*   It is the model after which the States of this Union, with scarcely an exception, have copied, with more or less modifications as to the time within which the action is to be brought.

The third section of that act is the one affecting personal contracts, and therefore the only one now to be considered.   It is as follows:   " That all actions of trespass *quare clausum fregit,* all actions of trespass, detinue, actions *in trover* and replevin for taking away of goods and cattle, all actions of account, and upon the case other than such accounts as concern the trade of merchandise between merchant and merchant, their factors or servants ; all actions of debt grounded upon any lending or contract without specialty ; all actions of debt for arrearages of rent, and all actions of assault, mayhem, battery, wounding and imprisonment, or any of them, which shall be sued or brought at any time after the end of this present session of Parliament, *shall be* commenced and sued within the time and limitation hereafter expressed, and *not after,* that is to say, the said actions upon the case (other than for slander) and the said actions for account, and the said actions for trespass, debt, detinue and replevin for goods or cattle, and the said action of trespass *quare clausum fregit,* within three years next after the end of this present session of Parliament, or within six years next after the cause of such actions or suits, and *not after;* and the said actions of trespass, assault, battery, wounding and imprisonment, or any of them, within one year next after the end of this present session of Parliament, or within five years next after the cause of such actions or suits, and *not after;* and the said actions upon the case for words, within one year after the end of this present session of Parliament, or within two years next after the words spoken, and *not after."*   (4 Eng. Statutes at large, page 752.)

The seventh and last section contains savings in favor of minors, *femes covert,* persons *non compos mentis,* imprisoned or beyond the seas.

The close similarity of the phraseology of this act with ours on the same subject, cannot fail to be noticed, and a plain, unsophisticated man, whose mind had not been poisoned by the subtleties of lawyers and courts, and by their artful but shallow reasonings to effect a bad purpose, would conclude that such a law, having no allusion or reference whatever to a defendant in any of the enumerated actions, and using terms of the strongest negative character, was intended by its makers to affect plaintiffs only—such persons only as had causes of *action.*

Such a man would search in vain for an indication in it of any other or different purpose ; and that such was the view the courts did, in fact, entertain of the statute, upon its enactment, its history proves.

The first decision under it, which I have examined, was made in the fourth year of the reign of Charles the First, the successor of James the First, and is reported in 4th Croke's Reports, 115, *Brown* v. *Hancock.* The reporter was one of the most eminent judges of the Common Pleas, alike distinguished for his ability and integrity. The case was in assumpsit, and *after verdict* for the plaintiff, it was moved in arrest of judgment, " that the promise is alleged to be made beyond the time limited in the statute of 21st James I, and the action is not brought *within* the time limited thereby." *All the court* held, " that if it appear so by the *plaintiff's own showing*, that the action is not brought *within* the time limited by the statute, the *plaintiff cannot maintain his action*, but judgment shall be given against him ; or if the contract in the assumpsit or debt be alleged to be within the time limited by the statute, and upon *nil debet* or *non assumpsit* pleaded, *it appears upon the evidence* that the assumpsit or contract was *beyond* the time limited, *the action lies not*, and the defendant shall take advantage thereof if it be specially found by the jury ; *for the statute is in the negative,* ' *that he shall not maintain such an action but within the time limited by the statute.*' "

This early ruling is very significant of the idea the enlightened jurists of that day entertained of this statute : that it was for the plaintiff to show affirmatively that he was within its provisions. *All* the court were impressed with a true sense of its character, its purposes, objects and intents, and found no other principle in it than this—an inhibition on parties to bring actions after six years—that it was to effect that single purpose only, its language being plain, simple and emphatic.

The King's Bench inclined the other way, and originated the rule, in 10th Charles I, in the case of *Stile* v. *Finch*, 4 Croke R. 381, that the statute must be pleaded, giving, in my opinion, a very unsubstantial reason therefor, namely, on account

of the savings or exceptions in the seventh section, some one of which, the plaintiff might reply, on the statute being pleaded.

The general rule is, and was then, that a party pleading the benefit of an act, or against its operation, must, by his own showing, bring himself within some one of its exceptions, and it will be conceded that it is quite as easy for him to do so in the first instance, in his declaration, as in his replication to a plea. This would be correct pleading, and in the strictest consonance with its admitted principles.

So in the case of *Hawkins* v. *Billhead,* ibid. 404, in an action for words spoken, the defendant pleaded not guilty, and found against him, and on motion in arrest of judgment, it was urged, "that by plaintiff's own showing, the action was brought for words spoken above two years." Two of the judges held he should have pleaded the statute, on account of the savings in it, and that *it would make the declaration too prolix to insert in it the causes why he did not sooner commence his suit.*" These "causes," the judges say, could be specified in a replication to a plea of the statute !

Others may perceive the force of these reasons; I cannot. If the declaration would be "too prolix" by inserting the causes, would not the replication be also ? It is manifest there is no force in such reasons.

Justice CROKE, however, adhered to his original honest and correct opinion, that "as, by the plaintiff's own showing, it appeared the action was not brought within the time limited by the statute, and as the statute is in the *negative,* that "it shall *not* be brought but within the time," the court " ought *ex officio* to abate it, unless the plaintiff had shown *affirmatively* wherefore *it was not* brought within the time."

This able judge looked the act in the face, with the honest design of enforcing its provisions ; saw its distinctive and well marked feature — that it was a disabling act — that its negative provision affected the plaintiff only — that it was inhibitory, and its true intention and design expressed in the strongest terms of which the English language is capable. He considered that it was the plaintiff's duty, by *his own* pleading, to remove his disability, no allusion being found, in the act itself, to a defendant, or his case or condition.

But in a later case (9th William III, *Draper* v. *Glossop,* 1 Lord Raymond, 153), a distinction was taken by Lord Chief Justice HOLT with regard to pleading the statute in an action of debt. In assumpsit, he thought the statute should be pleaded, because the assumpsit goes to the *praeter tense,* "but upon *nil debet* pleaded, the statute is ' good evidence,' because the issue is joined by words in the present tense—*per verba de presenti—*

and without doubt *nil debet* (he owes nothing) by *virtue of the statute;* and it is no debt at *this time,* though it *was* a debt."

It is difficult to say *why* a defendant may not take advantage of the statute in any action under the general issue, or by motion to the court, when the defect appears in the plaintiff's own pleadings, and require the plaintiff, as in other actions, to bring himself within some one of its savings. In all other cases known to the law, where an action is required by statute to be brought within a limited time, it is the duty of the plaintiff to allege and prove that he has complied with the terms of the statute; if he does not, he must fail in his suit. 3 Saunders R. 63, *note.* The reason assigned in the case referred to, and in *Lee* v. *Rogers,* 1 Levinz R. 110, seems to me to pervert the object of the statute, and is a misconception of its purpose. It is there said, " The statute was made for the *ease* of those who would take advantage thereof; but the court shall not give the defendant advantage thereof, if he will not plead it." Now there is nothing in the act itself to countenance such an idea. It has no reference or allusion to a defendant, or to pleadings on his part. How much more reasonable is it, as the statute is in the negative, to hold, with Justice CROKE, in *Hawkins* v. *Billhead,* 4 Croke R. 404, before referred to, that the court should *ex officio* abate the suit. If the ease of the defendant is the object of the act, this practice would effectually promote it, and such, in my judgment, is the true practice.

It is said the reason why, in penal actions, a party plaintiff must show affirmatively that he is within its provisions, is, that by bringing his action, and not before, he becomes entitled to the right of action; but in the other cases, a cause of action already exists and is vested in a plaintiff by means of some contract or other transaction between the plaintiff and defendant prior to his bringing the action. Let this be so, the statute interposes and takes away this right of action, and, by parity of reasoning, he can only regain it, as in penal actions, by showing affirmatively, by his own pleading, that he is within the savings, or requirements, or exceptions of the act. The statute extends back to the action itself, and takes it away, and, in phraseology, having no double or doubtful meaning.

This statute, as has been well said by learned jurists, is a statute of repose, and is the offspring of the growing commercial importance and policy of England, which received such a vigorous impulse in the reign of Elizabeth, when her subjects, roaming over every sea, had sought out and discovered new fields for their enterprise, and whose various and multiplied transactions by sea and land were measured by millions. To these, and to every class of society, the statute declared, in terms the most

positive, that certain claims, whether arising from contract, or from force and wrong, should not, after the lapse of certain specified times, be considered fit subjects for judicial inquiry; that they should not be harrassed by stale demands, or their repose disturbed by actions or suits in court on such demands. It was a well designed attempt to render powerless those who might seek to disturb this repose, or, if they did, to require them to show affirmatively that their actions were commenced so soon as they had the ability to commence them.

The courts, however, having given the statute another and a different character altogether, by perverting it from its original design, as acknowledged by themselves, the consequences resulting therefrom will be considered.

Instead of being a statute of repose, it has become a statute to disturb society; to open wide the door of litigation; to render a man odious in public estimation, by compelling him to plead it when it was not designed to be pleaded, and to invite and encourage perjury without limit.

The first device of the lawyers and courts, after it was ruled that the statute must be pleaded, was to *contrive* how best its most valuable provisions could be rendered null and void.

This will be seen in the case of *Dickson* v. *Thomson*, 2 Shower, 125, in 32nd Charles II. This is the whole case:

"ASSUMPSIT.—The statute of limitations pleaded. Replication, *quod assumpsit infra sex annos.* Issue thereon. Ruled by SCROGGS, C. J., upon evidence, and agreed by all the counsel, that *promise of payment* within the six years, though the debt were contracted long before, will *evade* the statute of limitations; but *confession,* or only *acknowledgment,* that he owed the plaintiff so much, will not do it."

Will *evade* the statute! I would ask where the court found the power to evade an act of Parliament? The statute was before them, telling the court, in plain terms, the action shall not be brought, and they evade it by allowing proof of a new promise, which had not been declared on, to be given in evidence to support a promise, an action on which had been taken away. On what correct principle of legal proceedings could the plaintiff have been allowed to prove a promise he had not alleged, and for which he had not brought his action?

Had the courts, however, left the doctrine here, that a promise of payment must be proved—and by that I understand an express promise—the mischief resulting might not have been so hurtful. But it was not to be so. Having established the principle, that the statute can be evaded, the next inquiry arose, What is the least amount of proof necessary for that purpose—how slight may it be? Accordingly, we see, in 10th William III, in *Hey-*

*lin* v. *Hastings*, Carthew, 470, that a *conditional* promise will do. The case was, "Indebitatus assumpsit, by Heylin, executor of one Read, a saddler, against Hastings, for goods sold by Read to the defendant. The defendant pleaded *non assumpsit* to the testator, *infra sex annos*, and upon evidence at the trial before HOLT, Chief Justice, the case was thus: The plaintiff, meeting with the defendant, Hastings, demanded so much money of him for saddles which he bought of the testator more than six years past before that time of their meeting. The defendant denied that he ever had such goods of the testator, but promised that he would pay the plaintiff for the saddles, *if he could prove that he, the defendant, had them*, which the plaintiff fully proved at the trial, and had a verdict. Whereupon, a case was made of this special matter, by consent of both parties, to be determined by the opinion of the Chief Justice, and the verdict was to follow the success of that determination; and now the case was moved in court, by the direction of the Chief Justice, to hear the opinion of the other judges. The point in law was, whether this conditional promise, made upon the denial of the debt demanded, should *revive* this debt, now the condition of the promise was performed, viz.: by proof of the debt, so as to bring it *out* of the statute of limitations.

It was admitted by all, that if this conditional promise did revive the debt, though it was made to the executor after the death of the testator, yet it was sufficient to maintain the issue, viz.: That the testator *assumpsit*, because the promise did not give any *new* cause of action, but only revived the *old* cause, and was of no other use but to *prevent* the *bar* by the statute of limitations.

*Nota.* That 2 Feb. 10 William III, Anno 1698, all the judges of England met at Serjeant's Inn, in Chancery Lane, upon this case; and they all agreed in opinion, that this promise, though conditional, (and since the condition was performed,) did revive the debt, and prevent the bar by the statute; and that a bare acknowledgment of the debt within six years of the action, is sufficient to revive it, and prevent the statute, though no *new* promise was made. That this conditional promise amounted to a waiver of the statute, and though no new promise was made, yet an acknowledgment of the debt is an evidence of a new promise. So the plaintiff had judgment."

It seems to me this adjudication is full of contradictions and absurdities.

In the first place, it is decided, this conditional promise, accompanied by a denial of the debt, revived the debt, which, Lord Holt said, in 1 Lord Raymond, 153, was extinct, dead and gone. Second, that a bare acknowledgment of a debt is suffi-

cient to revive it, and prevent the bar of the statute, though no *new* promise was made, thus overturning the case in 2 Shower, 125, decided a short time before. Third, that though no *new* promise was made, yet the acknowledgment (which, in this case, was a denial,) is evidence of a *new* promise ; and, last, that the declaration was not upon this conditional promise, but upon the old promise, on which old promise no right of action existed.

I cannot understand how this denial of the debt, and the conditional promise, operated as a waiver of the statute, when the statute was pleaded, and relied on as a bar by the defendant. It is manifest the defendant did not waive it, or intend to waive it.

In 2nd Lord Raymond, 1101, *Green v. Crane*, a case almost precisely like the case of *Heylin v. Hastings*, in which the defendant owned the debt, and promised to pay it, received a different ruling, and it was decided that the action could not be maintained, the promise being made to the executor, and so *out of the issue*. The promise, in both cases, was to the executor, and if out of the issue in Green's case, it was equally so in Heylin's case, for the issues were identical, " *non assumpsit infra sex annos to the testator*."

The distinction once existing between the effect of a promise to pay a debt barred by the statute of limitation, and a bare acknowledgment of the debt, to take it out of the statute, is no longer regarded. It has been discountenanced by all the courts in England, and by most in the States of this Union, our own among them. Breese R. 171 ; ibid. 218 ; 12 Ill. R. 148.

In England it is held, that an acknowledgment of the debt takes it out of the statute, even though such acknowledgment be made after suit brought. *Sir William Yea v. Forraker*, 2 Burrow, 1099. And the degrees of acknowledgment recognized by those courts, are as various as the caprices of men. For emample : " I am ready to account, but nothing is due you." " If he has any demand against me, it shall be paid." Cowper, 548, *Truman v. Fenton*. So in *Bryan v. Horsman*, 1 Bos. & Puller, 20, where the defendant acknowledged the original contracting of the debt, and that part of it was unpaid; but declared " he owed the plaintiff nothing, it being more than six years since he contracted ;" and in 16 East R 420, *Leafer v. Tatton*, where the defendant, acceptor of a bill of exchange, acknowledged his acceptance, but said, " he was not liable then, because it was out of date, and it was out of his power to pay it," were held sufficient to revive the debt, and prevent the bar of the statute ; and a simple remark by a defendant to the plaintiff, " what an extravagant bill you have delivered me," is such an admission that *something* was due, as to prevent the operation of the

statute.   Peake's Nisi Prius Cases, 127.   And a declaration by a defendant, that he would not pay, unless compelled, was held equally efficacious.   4 Maule & Selwyn, 75.   A mere acknowledgment to a stranger is sufficient.   4 Esp. R. 46, *Peters* v. *Brown*.   "The slightest word of acknowledgment," will, in the opinion of Lord Mansfield, take the case out of the statute, and "no honest man would defend himself by such a plea." *Quantock et al.* v. *England*, 5 Burrow, 2628.

These absurd rulings, though made by great men, caused one of the ablest jurists of England, the late Mr. Serjeant Williams, to say (2 Saunders' Reports, 64—*note*), "After all, it might, perhaps, have been *as well* if the letter of the statute had been strictly adhered to.   It is an extremely beneficial law, on which, as has been observed, the security of all men depends, and is, therefore, to be favored"—thus protesting the innocence of the victim, while the courts were immolating it.

Justice Croke and his associates did adhere strictly to the letter of the statute.   They entertained the true notion in regard to it.   They viewed it, not as involving the principle of presumption of payment, the evidence of which might be lost by lapse of time—not as made for the ease of defendants—not as a weapon of defense, of which a party *might* avail—not as a privilege he might *waive*—not as matter which he must plead, and which, in the judgment of Lord Mansfield, "no honest man would do," and which, by pleading, would subject him to public odium—not as a thing to be *evaded*—but, as it really is, and was designed to be, a bar to the *commencement* of suits of a certain character, after the lapse of a certain number of years, and out of the operation of which *plaintiffs* should place themselves by their own affirmative pleadings, or, failing so to do, their suits should be abated by the courts, *ex officio*, or on motion of the defendant.

The judges of England, confounded by their own variant rulings upon this statute, have declared that it is difficult to say whether the cases have proceeded on the ground that an acknowledgment is a *waiver of the statute*, or on the ground that it is evidence of the defendant's liability *once* existing, on which the law raises a new promise, for which the old liability is a good consideration.   1 Barn. and Ald. R. 92; 1 Barn. and Cress. 256; 2 Dowl. and Ry. 363.   They do not understand themselves, and I cannot understand them, but I can read and understand the statute, it is so plain and explicit.   These "difficulties" are the work of the judges themselves, in no wise chargeable to the statute.   They are the result of the departure from the first rulings under it—of erroneous views of its purposes, and of a settled design to destroy it, and in this encour-

aged by that great *imperator legis*, Lord Mansfield. He had much to do in producing this current of decisions against this most beneficial act, so acknowledged to be by all since his time. In appropriate and beautiful language, Judge Lamar, of the Superior Court of Georgia (Dudley's Reports, 145), in giving a reason why these various and hostile decisions against this statute had been encouraged, says : " It is owing more to the profound deference which is paid to the high character of Lord Mansfield, as a jurist, than from any thorough conviction of the soundness of the doctrine itself. It seems to be the prerogative of a lofty mind, not only to enlighten by its wisdom, but to enslave by its authority."

Lord Eldon, in a late case (*Baille* v. *Sibbald*, 15 Vesey R. 185), admitted that this statute had been construed with a view to *defeat*, not to *promote*, its object, and that the established construction was *against* its *true* principles," yet so galled by the chain of this great autocrat of the law, and feeling the fetters, he yielded without a struggle, essaying no corrective. So did Lord Ellenborough before him, in *Bryan* v. *Horsman*, 4 East R. 499, where he is reported to have said that " whatever might have been the opinion of the court upon the statute, had the question been *new*, yet, after the long train of decisions upon the subject, they were *bound* to hold that what was said by the defendant was a sufficient acknowledgment of the pre-existing debt to *create* an assumpsit, so as to take the case out of the statute." " Bound !" yes, *bound* by the chain of Lord Chief Justice Mansfield, more potent than his own honest regard of right, and the convictions of his own enlightened judgment.

Sir Vicary Gibbs, Chief Justice of the Common Pleas, in *Hellings* v. *Shaw*, 7 Taunton R. 608, expresses his regret over these decisions in this language : " If the courts could *retrace* their steps, and could see all the consequences that have arisen, they would have seen it *better* to adhere to the precise words of the statute than to attempt to *relieve* in particular cases."

Alarmed at these consequences, the English courts and law-yers determined that a " restoration" of this statute, which they had so causelessly and unjustly destroyed, was demanded by the best interests of the kingdom, and that the courts should galvanize the corpse, and set it upon its legs again.

Accordingly, we find the recent decisions of those courts more stringent than the old ones I have referred to, with, how-ever, an occasional lapse to them. So obnoxious had the whole doctrine inaugurated by them become—so revolting to the sense of right and justice entertained by all classes of the kingdom— that the aid of the Parliament was invoked, and, by statute of George IV, chap. 14, commonly called " Lord Tenterden's

Act," a written memorandum is made necessary to the validity of a promise barred by the 21 James I.   After the lapse of two hundred years from its passage, its object and intent having been frustrated by judicial legislation, it was thought proper by the Parliament "to make a provision for giving effect to the said enactments, and to the *intention* thereof."

By the first section of Lord Tenterden's Act, it is provided "that, in actions of debt, or upon the case, upon any simple contract, no acknowledgment or promise, by words only, shall be deemed sufficient evidence of a new or continuing contract, whereby to take any case out of the operation of the said enactments, or either of them, or to deprive any party of the benefit thereof, unless such acknowledgment or promise shall be made or contained by or in some writing, to be signed by the party chargeable thereby."   Other provisions of the act apply to joint contractors (two or more), or executors or administrators, who are not to be affected by an acknowledgment made by any one of them, and that a plaintiff may recover against one who has given such writing, though the action is brought against two or more.

To this extremity has England been driven to heal the wounds inflicted upon one of the best laws on her statute book, and to correct the evils flowing from the craft and design of her judiciary to destroy that law.   I have the authority of one of their learned judges (Lord Eldon) for saying it was *designed* by the courts to destroy the law.   Far better would it have been, in my judgment, for the Parliament to have re-enacted, with appropriate solemnity, the statute of 21 James, chap. 16, denouncing severe penalties against any judge or court who should attempt to distort the law from its original design, as declared soon after the original enactment, and in the brightest days of her earlier jurisprudence.

Time alone can determine of what avail this statute of George IV may be.   Judging from the past, and from the fate of a kindred statute—the Statute of Frauds, 29 Charles II, from which this act copies—it will be short lived, for the ingenuity of lawyers, and of usurping and unscrupulous courts, will be " exercised," to take cases out of its operation, and that they will succeed, first on one slight pretext, and then on another still more slight, no one can doubt.   They have in this way entirely swept from the statute book—it remaining there only in name— the Statute of Frauds.   Notwithstanding the express and positive command of the statute, those courts, and ours with them, ever anxious to follow bad as well as good precedents, have deprived that act of all its vigor, and all its usefulness, by ruling, that part performance of a verbal contract for the sale of land,

14

such as part payment of the purchase money, taking possession, and making improvements, shall be a binding contract and be enforced by action or suit in a court of justice, in defiance of the plain language of the act to the contrary, which declares that no action shall be brought on such a contract. Better, far better for the good of society, and in deference to the will of the people as expressed through the legislature, that full effect should have been given by the courts to them, and in the mode and for the purposes intended, requiring the plaintiff to show in his own pleading that his case is not within their letter or spirit. Then no occasion would have presented for the conflicting and absurd decisions and profound regrets of courts and judges with which the books abound, that they did not adhere, firmly, to the objects and purposes of these acts, and that they ever permitted cases to be taken out of their operation, to the destruction of the very statutes they were sworn to sustain.

In this rapid review of the history of the Statute of Limitations—its original purpose—the fluctuating and strange opinions, with the deplorable results flowing from them, I have confined myself wholly to the English statute, for the reason that the views I entertain, and the principles which guide me, can be properly illustrated by reference alone to that; and in conclusion thereon, I think I am safe in declaring, those courts mistook or misrepresented the principle on which the act was based—that they did not understand each other in its interpretation and enforcement, so many " various questions" having arisen under it as to render parliamentary interference necessary, and that the mischiefs can be successfully traced to the abandonment of the true principle of the act, as enunciated in the case of *Brown* v. *Hancock*, 4 Croke R. 115. In that iron-bound case there is no flaw; it is staunch and strong, and does honor to the court that made it. It preserves the act in its original purity—gives it the designed efficiency, and made it what its framers intended it should be, a statute of repose.

That the principle on which a majority of the late decisions are based, is a false one, seems to me most clear, from the rulings under the same statute in regard to *torts*. No admission of any kind, no matter how strong, or how understandingly made, will take such cases out of the operation of this statute. To such, it is a complete bar; and in such cases, the statute is applied with all its potency, except the party defendant is required, contrary to my idea of right and justice, to plead it. Yet if the reason given by commentators and by courts be sound, they should also be taken out. That reason is, and it figures prominently, that although the debt or contract be barred of recovery, " there is still a consideration remaining of the

highest kind, on which to base a subsequent promise, namely, the moral obligation every debtor is under to pay his creditors."

Admitting, for the sake of the argument only, this moral obligation, I insist that it is quite as weighty and imperative, to compensate for a wrong done by design, as on a contract made and broken.   Where, in reality, is the difference?

If there be such an element as " moral obligation " underlying cases of contract, sufficiently potent to support a promise to be enforced in a court of justice, I submit, that it should be equally powerful in aid of the man whose person has been brutally violated, whose property has been plundered, or whose landed estate has been entered upon, and withheld from him. Yet no such case can be found in the books, and therefore I feel free to regard this element of " moral obligation," as one of the many subterfuges and devices, invented by the courts in hostility to the statute, to destroy it.   If courts deal with the moral obligations, in one set of cases, to defeat a wise enactment, they should be impartial, and make it an element in all cases.

In what I have urged against the rulings of the courts, I am conscious the effort has had an appearance of presumption, but that I must bear as best I may.   It is not my nature, nor is it right, in my judgment, to bow in reverence to error, however consecrated by age, or sanctioned by the authority of great names.

My judgment leads me to this conclusion, that our statutes of limitations—R. S. 1845, ch. 66 ; Feb. 10, 1849, 132 ; of Nov. 5, 1849, 37, and of Feb. 17, 1851, 182—not only affirmatively declare within what time the action specified shall be commenced, but inhibit bringing them after that time ; and this intention is manifested by the words used, " not after," and " not thereafter," and that by no judicial jugglery, or craft, can any case be taken out of their operation—neither by an express promise nor an implied one ; that their provisions relate to the bringing the action, and not to the defense ; that they are not required to be pleaded by a defendant, but the *onus* rests on the plaintiff to bring himself, and his action within them.

But slight differences can be discovered between oar act and the British statute, and those not important in this argument. Both have the negative element in them, and both use the same imperious language, " shall be commenced within," etc., "*and not after.*"   Language cannot be stronger. or more expressive of the intent, than is here used—all indicating the position a plaintiff commencing his action must occupy.   No evidence is exhibited in it that the legislature designed it as a statute of " ease " to a defendant, which he should plead in order to avail himself of it and give it efficiency ; that it was a statute he

could waive or insist on; that promising to pay the debt after the five years rendered the act nugatory, and restored to the plaintiff a privilege he had lost. Nothing of this kind appears in it, and nothing in our history, at the time of its passage, gives color to any such suggestion.

It is directory to a creditor, and was intended as a rule by which he should conduct such of his business as might be affected by it. It says to him, in plain and unmistakable language, "You shall commence your action in five years, and not after;" after that time the courts are not open to you, unless you show, by affirmative pleading, you are within some one of the savings of the act. In the language of Lord HOLT, what was once a debt, after the lapse of five years, is a debt no longer for any available purpose. The people are not to be harrassed by stale demands; you shall not bring such suits into our courts; it is a statute of repose—you cannot make it a statute of discord and strife. This I conceive to be the true view of the statute and its purposes, and this, as I have shown, was the judicial and honest exposition of it soon after its enactment. To a statute couched in such language as this is, with no ambiguous expressions, and having negative words in it, which are "strongest in law," no equitable or other considerations should be given. It is not open to construction; it is a mandate of the people, expressed in the only legitimate form, and in the strongest language—"You shall," and "You shall *not*."

It is sufficient for me to know, "*ita lex scripta est*,"—thus the law is written. We have no dispensing power over it; it is there in plain language, on the statute book, and is the rule of action for us all, prescribed by the only power in the State, whose function it is to make the law.

It is true that occasionally an honest man may be prevented from recovering an honest debt, yet he alone is to blame for postponing his action. If such cases are hard cases, they afford no reason why courts should twist the law from its true meaning and purpose, and cast it away. It is admitted, by those judges who destroyed it, that it was a good law, gave society repose, and was intended to prevent actions for stale demands, only to be established, in very many cases, by rank perjury.

This court has not yet gone so far, in its adjudications upon this statute, as to render it difficult or hazardous to retrace its steps. But three cases, under it, have come before it, two of which are found in Breese—one, *Mellick* v. *De Seelhorst*, 171; the other, *Kimmel* v. *Schwartz*, ib. 218—and the last in 12 Ill. R., *Ayers* v. *Richards*, 148. In the first case, in Breese 171, it was decided that an unqualified promise to pay a debt barred by the statute was sufficient; but where it is accompanied with

a qualification, or upon a contingency, it rests with the plaintiff to do away the qualification, or show that the contingency has happened.

It, however, succumbs to that most odious doctrine, that an acknowledgment, by the defendant, that the demand is still due and subsisting against him, is sufficient, from which to infer a promise to pay; quite, it will be perceived, reaching up to the then prevailing doctrine. And this case also decides that proof of an actual payment of part of the debt by the defendant, or his authorized agent, is sufficient evidence from which the jury might infer a promise to pay the balance. This is going to the full extent of Lord Mansfield's doctrine.

In the other case, Breese 218, the court say: "The promise must be absolute and unqualified, and is not to be extended by implication or presumption beyond the express words of the promise." This was going quite as far as the most rational decisions of that day, by other courts, then justified.

In the late case, in 12 Ill. R. 148, *Ayers* v. *Richards*, by a majority of the court it was held: "there must be a promise to pay the debt, in order to take a case out of the statute." It is held also, "such promise may be *implied* from an unqualified admission that the debt is due and unpaid, nothing having been said or done at the time *rebutting* the presumption to pay."

And the court say, "it has even been regretted by many learned courts, that parol testimony has *ever* been allowed to *do away* with the *express* statute, and especially that any *implied* promise has been allowed to have that effect, for it certainly offers great inducements to pervert and distort the statements of parties in order to make out a new promise." And, further, arguing upon inferences from an admission, they say, "there should be an express admission of the fact that the debt had not been paid, in order to *infer* the *new* promise; that no more than one inference should be admitted when *dispensing with an express act of the legislature.*"

The court, in Charles the Second's time, used the words "*evade the statute;*" our court has been equally unfortunate in their choice of words, for in spite of one's self, and of all the reasoning, sound as it may be, from the premises, the question *will* arise, who gave the court power in the one case to "*evade*" and in the other to "*dispense*" with an express act of the legislature? It was the duty of the court to enforce the law; they had no power to dispense with it by construction, as, by their own admission, it was "an express act of the legislature," and about the meaning and intention of which it is scarcely possible to entertain a doubt, and in no one particular admitting con-

struction—it is imperative and mandatory, and made so by the use of the strongest words in our language.

This is the extent of the mischief our court has done thus far. Following the lead of those the profession unite to distinguish as great and learned jurists, confident in their pilotage, and in the accuracy of their observations and of their charts, they did not look out for the breakers or the shoals which have proved so fatal.

Experience teaches that judicial legislation is to be avoided. It is the rock of danger, standing high out of the water, and covered over with the fragments of its many wrecks. Let us steer clear of it while possible. To run upon it, when thus exposed, is not wisdom.

Believing these adjudications to be an evasion of the law, I feel it my bounden duty to disregard them, and to make the attempt to restore the law, even at the risk of being deemed presumptuous. I have more authority for my act than those have who aided in perverting and destroying the law.

A firm adherence to an express statute, unambiguous and plain in its language, containing no doubtful expressions, is an authority with me entitled to far more respect than a set of erroneous precedents, no matter how venerable by their age.

The argument used against the view I have expressed, and the only one, is, that when this State enacted the law, it must be supposed the legislature was familiar with the construction placed upon it in other States, and that we adopted it with those constructions.

This is true with regard to all statutes doubtful in their terms and fairly susceptible of different meanings. Long usage, or acquiesced construction, is evidence of what such statutes mean. But I deny that this principle has any application to a clearly expressed rule prescribed by the legislative power, governing the bringing of actions, or in any other case destitute of any ambiguity. The construction of a doubtful act is one thing, the annihilation of one not doubtful is another, and quite a different thing. By just and fair construction a law may be upheld, but one not open to construction cannot be destroyed, "dispensed with" or "evaded." It is absurd to say, the legislature, in enacting the statute of limitations, enacted at the same time its destruction, for, at the time of its enactment by our legislature, it had received its death blow from all the courts in England and in this country. It is a mistake—a total perversion of terms; it is not construction which has destroyed this statute, but *judicial legislation*, and that without apology or reason.

It can, with perfect safety and equal truth, be affirmed, that

the legislature did, of their own mere motion, enact a law which declares, in the plainest language, that certain actions on simple contracts " shall be commenced within five years next after the cause of such action shall have accrued, *and not after ;*" and so long as that law is in existence, unrepealed, and I occupy a seat on the bench, so long shall it be obeyed in its spirit and letter. If it bears hard upon the people, the legislature can repeal it, and ought to repeal it. While it remains, it shall be, at the same time, both my monitor and my guide. Wherever the will of the legislature is clearly expressed, I will obey it, regardless of consequences ; where not, then I will endeavor so to construe it as to carry out the object intended.

By such determination we will avoid the humiliation of wishing to "retrace our steps." Rather than be accessory to the death of this statute, I would prefer returning to the practice of the common law, anterior to its passage, and allow defendants to wage their law. Compurgators—and honest ones—would not be wanting.

Let what may happen, I take the law as found in our statute book as my only guide, and therefore declare, as my opinion, that no power exists in this court to take any case out of its operation ; that the statute goes back to the commencement of the action ; that plaintiff must show his case within its provisions ; that, failing to do so, or showing affirmatively by pleading, or by proof, that his action is not brought within the time, and he is not within any of the exceptions of the act, the court, on motion, or *ex officio,* should dismiss the suit.