JOHN R. BASSETT, Adm'r pro tem.,

v.

EMILY J. NOBLE.

1.  WHERE ADMINISTRATOR HAS A CLAIM—APPEAL BY ADMINISTRATOR PRO TEM.—Where an administrator *pro tem.*, having been appointed by the county court to appear and defend a claim filed against the estate by the administrator (R. S. Ch. 3, § 78), took an appeal to the circuit court.  *Held*, that the last sentence of section 78 of the statute does not by implication leave the estate, when defeated in the lower court, without remedy by appeal. Section 68 giving an appeal in all cases to either party, is not thus limited by section 78.

2.  LIVING IN FAMILY—SUIT FOR WAGES—DECLARATIONS.—Where appellee, who had lived for many years in the family of her uncle, was suing his estate for wages and money alleged to have been loaned, and the declarations relied on as a new promise to take the case out of the Statute of Limitations, did not amount to a recognition of a legal liability or indebtedness on any account, but were expressions of a desire from a sense of gratitude to reward the claimant, and related to her work alone and not to money loaned, and were not made to her or her agents legally or equitably interested in the claim.  *Held*, that such declarations would be insufficient to revive an indebtedness, if any existed, barred by the statute.

3.  INTEREST.—Where there was no evidence of an agreement to pay interest, and the principal due, if any, was not fixed, certain or agreed upon, but was upon a running and unsettled account, interest could not be recovered.

APPEAL from the Circuit Court of Mercer county; the Hon. JOHN J. GLENN, Judge, presiding.   Opinion filed August 20, 1884.

Messrs. BASSETT & WHARTON, for appellant; that the entries would be admissible to show payment of a preceding debt, but not that it was a loan of money, or that a debt was created by it from the person who made the entry or in whose

Bassett v. Noble.

book it was made, cited Adams v. Taylor, 21 Ill. 102; 2 Green-leaf on Ev. § 112; 4 Phillips on Ev. 121; McKinstey v. Pearsoll, 3 Johnson, 319.

Appellee is estopped from claiming wages unless an express contract is proved: Fetterhoff v. Paul, 73 Ill. 173; Morton v. Rainey, 82 Ill. 215; Miller v. Miller, 16 Ill. 296; Freeman v. Freeman, 65 Ill. 106; Byers v. Thompson, 66 Ill. 421; Griffin v. Bank, 74 Ill. 259; Meyer v. Temme, 72 Ill. 574; Brush v. Blanchard, 18 Ill. 46.

As to allowance of interest: Sammis v. Clark, 13 Ill. 544; City of Chicago v. Allcock, 86 Ill. 384; Devine v. Edwards, 101 Ill. 142; West Chicago Alcohol Works v. Sheer, 104 Ill. 586; Flake v. Carson, 33 Ill. 526; Myers v. Walker, 24 Ill. 133.

Mr. Louis D. Holmes, for appellee; as to the right of appeal, cited R. S. 1884, Ch. 3, § 72; Hesing v. Att'y General, 104 Ill. 295; Schooner Constitution v. Woodworth, 1 Scam. 511; Lewis v. Shear, 93 Ill. 123.

Facts and circumstances may be shown that will imply a promise to pay and an express contract need not be shown: Warren v. Warren, 105 Ill. 567; Freeman v. Freeman, 65 Ill. 106; Byers v. Thompson, 66 Ill. 421.

Pleasants, P. J.   Appellee, in 1848, at the age of four years, having lost her mother, was bound, with a younger brother, to her grandfather, William Crapnell, who died in 1859.   Before his death the farm on which he lived had become the property of his son, appellant's intestate, by whom it was then being carried on and with whom his widowed mother, an unmarried sister, appellee's brother (afterward killed in the war) and appellee continued to reside.   His mother died in 1871.   His sister married in 1877, but remained with him except for a year or less during which she was in Texas.   In 1870 he took to raise a bound girl, then of the age of twelve years, who lived with him until 1876, after which the family or household consisted of himself, his sister and the appellee, until his death.   Besides the usual farming operations he cultivated for the last five or six years a truck garden.   Appellee,

Bassett v. Noble.

from the time she was physically able, was always industrious, faithful and helpful, doing housework mainly, together with her aunt and the other girl mentioned, but frequently assisting him in the garden and on two or three occasions in unloading and shucking corn. That he highly appreciated her services and character was shown by invariable kindness in his conduct and expressions. He sent her away to school at Aledo before she became of age and kept her there afterward, providing for her tuition, board and other expenses, and later at the Sister's Academy in Davenport, Iowa. He took her with him to church and on his visits about the neighborhood, and allowed her to buy for herself at the stores in town what she saw fit, on his credit, without restriction. Every witness on both sides testified that she was treated in all respects just as a member of the family.

She had $50 from her grandfather's estate in March, 1866, and small sums occasionally from her grandmother, the highest shown being one dollar. She also did some sewing for other persons from time to time for which she received pay, and some premiums at fairs. This is all that appears in relation to her pecuniary means or resources.

Neither she nor her uncle ever kept an account with the other. There was never any express contract nor anything whatever said between them about wages or other compensation for her services, although he undoubtedly intended as he repeatedly stated to provide for her liberally with land, as a reward for her faithfulness, which she well deserved. But without executing it, in December, 1881, he died, a bachelor, intestate.

Appellee became his administratrix, but having a demand of her own against the estate, which she filed Nov. 25, 1882, the county court appointed appellant to appear and defend for it. On the trial there she was allowed $3,350, and in the circuit court on appeal, $2,500, of which $500 was remitted, and thereupon the motion for a new trial was overruled and judgment entered for the claimant for $2,000. Bassett then appealed to this court.

Appellee has assigned for cross-errors that the circuit court overruled her motion to dismiss the appeal from the county

court, and allowed Bassett to file an amended appeal bond. It is contended that his functions ended with the trial in the county court, and that the circuit court acquired no jurisdiction of the case so as to allow an amended bond to be filed, or take any other action therein but to dismiss the appeal.

For this proposition counsel relies on the provision of the statute under which Bassett was appointed, being § 72 of Ch. 3 of the R. S., and as follows:

"When an executor or administrator has a demand against his testator or intestate's estate, he shall file his demand as other persons; and the court shall appoint some discreet person to appear and defend for the estate; and upon the hearing the court or jury shall allow such demand, or such part thereof as is legally established, or reject the same, as shall appear just. Should any executor or administrator appeal in such case, the court shall appoint some person to defend as aforesaid."

The argument is, that the right to appeal, for a trial *de novo*, is derived wholly from the statute and can be exercised only in the cases and manner and to the extent thereby allowed, and that the power of appointment to appear and defend for the estate on appeal, being given only where the executor or administrator takes the appeal, it does not exist where he does not take it. And therefore, is the anomalous and startling conclusion, though the claimant may appeal the estate may not.

From this view we must dissent. The right of appeal is not derived by either party from this section. It recognizes but does not confer it. That right is given by the 68th section, which declares that "in *all* cases of the allowance or rejection of claims by the county court, as provided *in this act, either* party may take an appeal from the decision rendered to the circuit court of the same county," etc. This was such a case. The only peculiarity about it was that the general representative of the estate was the party adverse to it. It was necessary, therefore, if a defense was to be allowed, to provide somebody to appear for it specially *quoad hoc*. Section 78 meets this necessity and no more. John R. Bassett was duly appointed for that

purpose. He was not thereby made administrator, but the attorney for the estate in this case; and although the authority conferred by the appointment may not have extended beyond the case in that court, it embraced all that an attorney duly appointed for any other party could legitimately do in such case in that court. If successful on the trial there, no further action on his part would be required. His functions under the appointment would be ended, and the fact that he tried the cause below would not authorize him to appear on appeal in another court. Covill v. Phy, 24 Ill. 37. Hence, the necessity of the provision for a new appointment where the claimant appeals. But if unsuccessful, and he thought it his duty, then by further and legitimate action in that court, *to wit*, by filing a proper bond and getting it approved, he would acquire a *status* in the circuit court on appeal, by operation of the law and the express sanction of the county court. Hence there was no necessity for a provision for a new appointment in that case. In our opinion, then, the last sentence in section 78 does not, by implication, leave the estate, when defeated in the lower court, without remedy by appeal, and thus limit the operation of the 68th, which in the clearest terms gives it in all cases, to either party. The cross-errors are not well assigned.

Appellee's account of her claim as filed embraces:

First, money loaned, in eight sums aggregating $302.40, the latest of which, with one exception, is charged as of July 6, 1871. Of the one excepted, which is of August, 1881, amounting to $30, there was no evidence offered. The same is true of another item of $40. Of the others, excepting the $50 from her grandfather's estate in 1866, the receipt of which it was said he verbally admitted, the only evidence consisted of entries in his " Cash account," in pocket diaries of 1869 and 1870, in the following form: " Of Em. $—" or " Cash received of Emma $—." We do not say that these entries were incompetent, but it must be apparent in the light of the evidence as to the relations of the parties and her pecuniary means, and from some of the amounts stated, as $113.*10* and $14.*40*, and the place and manner of their appearance, that their weight as

proof of loans is but slight.    Certainly they are not inconsistent with the supposition that the sums mentioned were moneys received by her for him, and paid over at the times respectively stated.    According to the evidence, " she sometimes did sell things from the market garden when he was away from home, and would give the money to him."

However that may be, these items were all barred by the Statute of Limitations, unless revived by a new promise sufficient for that purpose.    Upon a careful examination we fail to find any evidence that he ever in any way alluded to these items or either of them, or to such indebtedness to her as for money loaned, or for any cause that could embrace money loaned.    All of it that the record shows which can refer to or include these is the naked entry as made in the diary.    The instructions numbered 3 and 5 given for the claimant, upon the subject of new promises to revive a claim otherwise barred by the statute, applying as well to those as to any other items of her claim, were therefore erroneous as given.

Second, wages, being for fifteen years at $4 per week, $3,120. No witness testifies to the value of her services, or to any facts upon which to estimate or infer them.    James Pullen says: " Farm hands were worth from a dollar to a dollar and a half a day—plaintiff did not work in the field a great deal, only worked occasionally."    Charles Penny says: " I did the field work.    Plaintiff assisted William in the truck patch while I was there—would do as much as he did generally.    She did the housework.    Hired hands, men, were worth $18 per month, including board.    Emily did not work with us in the field."    Anna Corken says: " I can not say what her work was worth.    Farm hands were worth one dollar per day, or $18 per month"; and Edwin A. Crapnell says: " Wages for girls were $2 per week during the time Emily was at brother's, for housework, with board."    It does not appear directly or by reasonable inference that she worked in the field as much, in all, as four days, and how much is entirely uncertain.    Her aunt, who was there all the time except about a year, and assisted in the housework, says she " never saw her in the cornfield plowing or gathering corn, but saw her once or twice

unloading corn." Anna Corken, who lived for eighteen years within a mile and a half, and was there frequently, saw her unloading corn once. Hannah Crapnell, a sister-in-law of the deceased, who knew the claimant from her childhood, and was often there, " never saw her working in the field." Edwin A. Crapnell, brother of deceased, says the same. Mary Moseley, who knew her and her uncle from her earliest recollection, saw her " doing all kinds of housework but never working out of doors." Those who did so see her fail to specify any number of times and speak of them as only occasional and very rare. The truck patch had been cultivated for five or six years; for the last year or two the deceased was not able to do much of the heavy work, and claimant helped him considerably; but the evidence furnishes no means of estimating the time or amount. The housework which she did quite regularly, was not heavy, as is expressly shown, and during nearly all the time she had help. So that the most certain and definite evidence of the value of her services is the testimony of Edwin Crapnell, that girls' wages were $2 per week.

This claim also is barred for all but five years, unless a new promise was shown. And here we find no evidence whatever of any promise or expression on the subject by the deceased to the claimant. In every instance the language is shown to have been addressed to some other person who was neither her agent to receive a promise or do anything else in respect to her claim, nor one having any legal or equitable interest in it.

In only one was she present. On that occasion, which was in November, 1881, a month or so before his death, he said " she must and should be paid for her work, and that he wanted to make her a deed of the north eighty acres—he wanted to pay her for her work;" but on cross-examination the witness, her aunt, Mrs. Stephenson, testified that " what he said about it was said to me; he said Emma had been a good girl; had worked hard, and he wanted to *reward* her for it." About the same time he said to Alexander Davis: " I have *concluded* to give Emma all I have; she has been such a good girl and help to me." Elwood Moseley says he heard

him tell Edwin that "he wanted Emma well paid; that she had been a good, faithful girl, and he wanted her to have all his real estate." Anna Corken says she heard a conversation between William, his brother, Edwin, and C. W. Bras, when William was on his death bed, in which he said: "Edwin, I want Emma to have my real estate; she has been a good, faithful girl, and worked hard, and I want her well paid. Edwin said she should have it, and William said that will be right." Both Edwin and Bras deny this, and say that William was very low; that Bras had been sent for to draw his will; that on this subject he went only so far as to say that "he wanted all of his real estate—," and then stopped, being unable to finish the sentence.

The foregoing is all the evidence that is claimed to show a new promise. Of which it is to be observed first, that these declarations hardly amount to a recognition of legal liability or indebtedness on any account, but are rather expressions of a desire, from a sense of gratitude, to reward the claimant; second, that they relate to her *work* alone, and not to money loaned, or any other cause; and third, that they were not made to her or her agent, nor any person legally or equitably interested in the claim. Such declarations would be insufficient, for either of these reasons, to revive an indebtedness barred by the statute: Keener v. Crull, 19 Ill. 189; Norton v. Colby, 52 Id. 193; Wachter v. Albee, 80 Id. 47; McGrew v. Forsyth, Ibid. 596; Bloomfield v. Bloomfield, 7 Bradwell, 261; Katz v. Moessinger, Ibid. 536.

For these reasons also, then, the instructions above referred to, Nos. 3 and 5 for plaintiff, were erroneous. Each of them assumed that there was some evidence tending to show language used by deceased *to the claimant*, admitting a *debt* to be due to her from him, and showing an intention to *pay* it.

Interest amounting to $1,200 is charged on the sum so claimed for wages. If the views above expressed are sound, interest is chargeable only on the unpaid wages for five years at the most. But we think none could be lawfully recovered, because there was no evidence of an agreement to pay interest, and the principal due, if any, was not fixed, certain or

agreed upon, but was upon a running and unsettled account. Ditch v. Vollhardt, 82 Ill. 134; Cooper v. Cooper, 12 Bradwell, 478; Ibid. 421. The instruction numbered 10, asked by defendant but refused, was proper, because, as we have attempted to show, there was no evidence tending to support the claim for interest.

The next item is for use of horse for eleven years, $275. All that the record shows in relation to this is contained in a single sentence of the testimony of Mrs. Stephenson, which is as follows: "Plaintiff owned a horse that my brother had on the place for twelve or fourteen years, and it was used in doing all kinds of work." How much of this time, if any, was within five years of the filing of the claim, on what terms the horse was used, if any were agreed on, or how much it was worth if not agreed on, are matters of pure conjecture. Of course no interest was recoverable on this item.

The last is for nursing in last illness, twenty days and nights, $100. We quote all the evidence on the part of the claimant in reference to this, which is from the testimony of Anna Corken: "Mrs. Stephenson was sick—very low—during William's last sickness. Plaintiff waited on both of them and did the housework, washing included. Her services during that time were worth five dollars per day." What time? How many days? The claim is for twenty days and nights. This witness on cross-examination says: "I was at the house two days before William died. I only saw Emma working two days; there were two men with William both nights that I was there." And Edwin testifies: "I was with him almost constantly during his last illness; was there every night and the greater part of the day time. Mr. Foy, Mr. Moseley and others were there, two men remaining with him every night. Miss Noble did not nurse him or set up with him. She was doing the housework." Manifestly this item is not proved but is disproved. And thus the entire claim, if any, is reduced, by the proof, to five years wages at a rate materially less than is charged.

The general defense insisted on as against the claim for services was that they were rendered, not as a servant, but as a

member of the family; without any promise, express or implied, or any expectation of wages; and from what has been said it is apparent that there was much evidence to sustain it. Claimant was not bound to her grandmother, though it was intended she should be to both grandparents during her minority if they should live so long. She was under age when her grandfather died, and William B Crapnell might stand to her *in loco parentis*, which would constitute the relation of parent and child so far as it affects the matter in controversy. Whether he did in fact was a question for the jury. Yet by the fourth instruction for claimant, they were told, as matter of law, that "she did not occupy the same relation to him as his child," and thereby the question was withdrawn from their consideration, which was error.

Whatever claim appellee may have upon grounds of moral right against this estate, we are constrained to find, from a legal standpoint, that the verdict was for a much larger sum than is supported by the evidence. For the errors above indicated the judgment will be reversed and the cause remanded for further proceedings not inconsistent herewith.

Reversed and remanded.